Daniel WEBSTER, et al., Plaintiffs,

v.

FULTON COUNTY, GEORGIA,
et al., Defendants.

No. Civ.A. 1:96CV2399TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 12, 1999.

Richmond Mason Barge, Parks Chesin & Miller, Atlanta, GA, Patrick W. McKee, McKee & Barge, Atlanta, GA, for, plaintiffs.

Linda T. Walker, Office of Fulton County Attorney, Atlanta, GA, Keith Mark Wiener, Holland & Knight, Atlanta, GA, for Fulton County, Georgia, defendant.

J. Scott Carr, Altman Kritzer & Levick, Atlanta, GA, Linda T. Walker, Office of Fulton County Attorney, Atlanta, GA, Keith Mark Wiener, Holland & Knight, Atlanta, GA, for Mitch J. Skandalakis, Michael Hightower, Nancy A. Boxill, Emma I. Darnell, Gordon L. Joyner, Tom Lowe, Robert E. Fulton, defendants.

### ORDER

THRASH, District Judge.

This is a complex race and sex discrimination case brought pursuant to 42 U.S.C. §§ 1981, 1983, and the Equal Protection Clause. It is before the Court on the (1) Plaintiffs' Motion for Summary Judgment [Doc. No. 103]; (2) Defendants' Motion for Summary Judgment [Doc. No. 105]; and (3) Defendants' Motion to Strike the Affidavit of Thomas Bruns [Doc. No. 119]. For the reasons set forth below, the Court will (1) deny the Plaintiffs' Motion for Summary Judgment; (2) grant in part and deny in part the Defendants' Motion for Summary Judgment; and (3) deny the Motion to Strike the Bruns Affidavit.

### I. BACKGROUND

The Plaintiffs bring this action on behalf of themselves and others similarly situated to redress the alleged deprivation of rights under 42 U.S.C. § 1981 and the Equal Protection Clause, as enforced by 42 U.S.C. § 1983. The Plaintiffs also assert state claims under the Georgia Constitution and O.C.G.A. § 48-5-220. The named Plaintiffs are Daniel Webster (white male), Peggy Webster (white female), Kelly Goff (white male) and The Webster Green Thumb Company ("Green Thumb"). The Defendants consist of (1) Fulton County; (2) individual members of the Fulton County Board of Commissioners ("Board"); and (3) Michael Cooper, Director of the Department of Contract Compliance and Equal Employment Opportunity ("Department") for Fulton County. Plaintiffs claim that the Defendants discriminated against them because of their race and gender. Their principal claim is that Fulton County operates an illegal Minority and Female Business Enterprise program that favors minorities and females in the award of contracts for goods and services.

Fulton County adopted its first minority business enterprise program in 1979. (Doc. No. 103, Exh. B). The Board at that time resolved to begin an affirmative action program with a goal that at least 20% of all County public contracts be awarded to minority bidders. (*Id.*). The Board passed resolutions continuing the program in 1984 and 1987. The 1987 resolution established the Office of Contract Compliance and Equal Employment Opportunity. In 1988, Defendant Cooper was hired as its first Director. In 1989, the Board commissioned Dr. Andrew F. Brimmer and Dr. Ray Marshall to conduct a fact-finding study relating to the participation of minorities and females in the Fulton County marketplace. Dr. Brimmer and Dr. Marshall also studied whether discrimination against minority-owned and female-owned business enterprises ("MFBE's") has reduced their participation in the public and private sector contracting and procurement activities in the Atlanta and Fulton County marketplace. (Doc. No. 105, Second Cooper Aff. ¶ 3). In 1990, Dr. Brimmer and Dr. Marshall produced and sub-

mitted to the County and City of Atlanta the Brimmer–Marshall Study which consisted of eight volumes entitled: "Public Policy of Minority Economic Development." Dr. Thomas Boston, an economics professor, prepared a report for the Brimmer–Marshall Study entitled "Discrimination and Economic Development: Effects on Minority and Female Business Enterprises." (Doc. No. 105, Boston Aff., Exh. B). According to Dr. Brimmer and Dr. Marshall, the Boston report (contained in Part III of the Study) shows that MFBE's have experienced inequitable treatment and discrimination in obtaining contracts in Fulton County and the City of Atlanta in both the public and private sectors.

In 1992, the Board passed resolutions accepting the findings of the Brimmer–Marshall Study. In 1992, Fulton County conducted open public hearings in which numerous individuals provided further anecdotal evidence regarding their experiences in the Fulton County contracting and procurement activities and practices in the Atlanta/Fulton County marketplace. On October 21, 1992, the Board authorized the implementation of a MFBE Program under the auspices of Defendant Cooper as the Director of the Department. (Doc. No. 105, Second Cooper Aff. at ¶ 5, Exhs. A and B). In 1994, the Board engaged Dr. Boston to conduct a post-disparity-study. Dr. Boston submitted this study to the Board in June, 1994. In the post-disparity study, Dr. Boston noted significant-improvements since the Brimmer–Marshall Study as reflected by "increased utilization percentages for minority and female vendors, significant improvements in the operation of the Offices of Contract Compliance and the Purchasing Department, and the centralization of purchasing activities." (Doc. No. 105, Boston Aff., Exh. C). However, the report also noted problem areas such as the low utilization of minority and female vendors on commodity and supply contracts. (Id.). As a result, Dr. Boston recommended in the post-disparity study that bid preferences be given to minority and female vendors in connection with commodities and supplies contracts. (Id.).

Dr. Boston appeared before the Board and described the benefits of the MFBE program. These included the stimulation of minority and female entrepreneurship, and facilitating the "growth and the diversification, as well as the employment and financial capacity of [MFBE] firms." He stated that MFBE programs of the City of Atlanta, Fulton County and MARTA were "primarily responsible for the fact that now the black-owned businesses in the metropolitan area currently have the highest rate of business formation of any metropolitan area in the country." He summarized his recommendations from the post-disparity study as follows: (1) the MFBE Program remains warranted due to the fact that the present effects of past discrimination have not been remedied; (2) the scope of contract awards reported to the Board should be altered to include a broader range of awards; (3) contract awards should be reported at three levels: above $20,000, below $20,000, and all awards; (4) the format for reporting utilization figures should be completely revised; (5) the uniform contract sign-off sheet should be altered to get detailed information regarding gender and ethnicity; (6) minority and female utilization on commodities, supplies, and contracts under $20,000 should be increased; (7) strong consideration should be given to instituting preferences for local Fulton County firms; and (8) a methodology should be developed for setting MFBE goals that are based on the availability of minority and female firms and the amount of discrimination. (Doc. No. 105, Second Cooper Aff., Exh. C).

The Board approved and adopted Dr. Boston's post-disparity study on June 15, 1994. The Board then directed that the Department implement amendments to the MFBE Program based on the post-disparity study. On July 20, 1994, the Board passed a resolution adopting certain amendments to the MFBE Program based

upon the post-disparity study. Defendant Cooper combined the approved amendments with the existing MFBE Program, resulting in the 1994 Fulton County MFBE Program. (Doc. No. 105, Second Cooper Aff., Exh. G). Thus, the Board established the 1994 MFBE Program to alleviate the effects of past and present discrimination against minority and female business enterprises and to enhance contracting opportunities for those minority and female businesses. (*Id.* at 2). The Board concluded that there were no reasonable race and gender neutral policies available to accomplish these objectives. (*Id.* at 9–10).

The 1994 MFBE Program set forth the following annual business participation goals for the following groups: (1) African–American business enterprises—26%; (2) Hispanic business enterprises—1%; (3) Asian–American business enterprises— 1%; (4) Native American business enterprises—1%; and (5) Female business enterprises—6%. (*Id.* at 16–17). The MFBE Program provided that these goals were in effect for five years and are subject to an annual review and adjustment by the Department and approval by the Fulton County Manager and Board. (*Id.* at 17). Pursuant to the MFBE Program, the participation goals for minority and female business enterprises are not considered to be fixed quotas. (*Id.* at 19). The participation goals for each project or contract are set by the Department's Director based on the following non-exclusive list of factors: (1) the number of minority and female business enterprises known to be available for the type and value of service to be obtained; (2) a forecast of all eligible contracts to be awarded within the coming fiscal year, specifying the type and value of goods and services to be obtained; (3) the minority and female business enterprise percentages of the total number of business entities known to be available for the type and value of goods and services to be obtained; (4) the statistical and data sources by which each goal was calculated; and (5) the statistical and data sources

from the 1994 post-disparity study. (*Id.* at 18–19).

The MFBE Program further provided that the good faith efforts of a potential contractor to meet minority and female business participation goals shall be considered in deciding contract awards. (*Id.* at 19). These good efforts include, but are not limited to: (1) attendance at pre-bid meetings which are scheduled to inform minority and female business enterprises of prime and subcontracting opportunities; (2) advertisements in general circulation media, trade association publications, and minority and female enterprise media to provide notice of opportunities; (3) written notice to known minority and female business enterprises soliciting their interest in opportunities; (4) efforts made to select portions of work for minority and female businesses subcontracting in areas likely to be successful; (5) efforts to negotiate with minority and female businesses for specific subcontracting; (6) efforts made to assist minority and female businesses to meet bonding, insurance, or other governmental contracting requirements; (7) a statement of reasons why a particular minority or female business enterprise contacted is not qualified for a contract; and (8) communication with the Department seeking assistance for identifying minority and female business enterprises. (*Id.* at 19–20, 34–35). An Invitation to Bid ("ITB") for a contract over $20,000 contains a short form description of the MFBE Program, including a part where the bidder must demonstrate his good faith efforts by completing a checklist documenting any good faith efforts. (*See* Doc. No. 103, Exh. E).

The MFBE Program provided that it applied "to the totality of Fulton County procurement and contracting, including construction and the acquisition of all commodities, equipment, goods and services (including professional services), however titled and irrespective of the modality or manner procured, and irrespective as to

whether purchased or leased." (Doc. No. 105, Second Cooper Aff., Exh. G at 22). Accordingly, the initial categories established by the Board that were encompassed under the MFBE program were listed as (1) construction; (2) commodities; (3) services; and (4) professional services. (*Id.* at 22–23). Fulton County reserved the right to amend these categories upon recommendation by the Fulton County Manager and the Board. (*Id.* at 22).

The 1994 MFBE Program provided that the Department shall evaluate and set appropriate minority or female business participation goals for each specific project or contract. (*Id.* at 25). The Department should consider (1) the nature of the project or contract and the relevant specifications; (2) the availability of minority and female business enterprises in various industry classifications and professions which are ready and able to provide goods and services on the particular project or contract; (3) the level of participation of such firms on past projects or contracts awarded by Fulton County; and (4) other relevant factors. (*Id.* at 26). The MFBE Program proposed several methods to achieve the minority and female business participation goals as follows:

(1) *Minority and female business enterprise solicitations on procurement purchase orders.* For all purchases, each Fulton County buyer and any other Fulton County employee having the authority to procure is required to contact at least one minority or female business enterprise bidder.

(2) *Joint ventures program.* The department shall encourage, where economically feasible, establishment of joint ventures and mentor protege programs to insure prime contracting opportunities for minority or female business enterprises on eligible projects. If the prime contractor is a minority or female business enterprise or a joint venture between minority and female firms, subcontracting participation with minority and female business enterprises shall be required on all projects exceeding $10,000,000.

(3) *Mentor/protege ventures.* The Department encourages mentor/protege programs to assist individual minority and female business enterprises in financing, bonding, construction management and technical assistance.

(4) *Minority and female business enterprise subcontracting and supplier purchasing goals on construction projects and other contracts.* The Department shall ensure the maximum practicable opportunity for minority and female business participation by requiring that all bidders on a designated project or contract comply with certain remedial measures.

(5) *Construction Subcontracting.* The department may impose a requirement that bidders wanting to serve as prime contractors on a bid for a Fulton County construction project identified under Program Scope shall subcontract with minority and female business enterprises for a stated percentage of the dollar value of the project.

(6) *Subcontractor participation.* Where a prime contractor utilizes one or more subcontractors to satisfy its minority or female business participation commitment, the prime contractor may count only expenditures to minority and female business enterprise contractors that perform a commercially useful function in the contract work.

(7) *Suppliers participation.* Where a prime contractor utilizes one or more suppliers to satisfy its minority or female business participation commitment, credit will be given toward the applicable goal as follows: (1) 100% of the contract amount for minority and female business suppliers who manufacture the goods supplied; (2) 100% of the contract amount for minority and female business suppliers who are wholesalers warehousing the goods supplied; and (3) where an extraordinarily large portion of the contract price is for equipment or sup-

plies, a lower project goal may be set than otherwise would be required.

(8) *Professional services.* Where Fulton County requires the utilization of professional consultants, the Department shall make knowledgeable and available minority or female business enterprises aware of opportunities to serve as primary consultants on bids.

(*Id.* at 27–33).

The 1994 MFBE Program provided that the Department's Director may grant administrative waivers where reasonable good faith efforts are established, where the situation is deemed to be an emergency, and where deemed appropriate by the Director, the Fulton County Manager and the Board. (*Id.* at 36). A bidder or offeror may seek a partial or total waiver of the project goals. The application for a waiver shall include documentary evidence of the bidder's or offeror's good faith efforts to meet the project goals and why the request should be granted. (*Id.* at 37).

The 1994 MFBE Program provided that all firms participating as either a minority or female business enterprise must be certified before the award of a bid or execution of a contract after review and evaluation as to compliance. (*Id.* at 45). In determining whether a firm is eligible to be certified, any minority or female firm engaged in or attempting to engage in business in the Fulton County Metropolitan Statistical Area before July 20, 1994, is rebuttably presumed to have suffered past racial or gender discrimination and is therefore an eligible minority or female business enterprise. In order to be a certified minority or female business enterprise, the firm or joint venture must comply with certain eligibility standards regarding minority or female control and ownership of the firm or joint venture. (*Id.* at 47–49). The Department reviews whether there is sufficient minority or female operational or managerial control so that the firm can be certified. (*Id.* at 49–51). Finally, the 1994 MFBE program

provided that it shall expire five years from its effective date. (*Id.* at 55).

Plaintiffs Daniel and Peggy Webster own and operate Green Thumb, a landscaping and tree removal service. Green Thumb, formerly known as the Family Tree, applied to Fulton County for certification in 1993 as a female business enterprise. (Doc. No. 55, First Cooper Aff. at ¶ 5, Exh. A). In the Minority/Female Business Enterprise Disclosure Statement, Peggy Webster was listed as the company's owner. (*Id.*). On December 1, 1993, Defendant Cooper, as Director of the Department, notified Peggy Webster that the Department had certified the company as a female business enterprise. (*Id.*). By letter dated March 4, 1995, Peggy Webster informed the Department that the company name had changed from the Family Tree to Green Thumb. In the letter, she requested that the company continue as a female business enterprise. (Doc. No. 55, First Cooper Aff. at ¶ 6, Exh. B). Although Green Thumb did not submit a new Minority/Female Business Enterprise Disclosure Statement, Cooper attested that the Department did not decertify or disqualify it from the MFBE Program. (*Id.* at ¶ 7).

On March 10, 1995, Fulton County opened a bid for tree removal services for the Department of Public Works. Ben Edwards Landscaping Company ("Edwards Landscaping"), a certified minority business enterprise owned by Ben Edwards, submitted a bid for the tree removal work. (Doc. No. 105, Second Moore Aff. at ¶ 3, Exh. A). Green Thumb also submitted a bid for the tree removal work. (*Id.*, Exh. B). In its bid, Green Thumb specified that it is a female business enterprise. (*Id.*). On May 3, 1995, the Board awarded the bid to Green Thumb and Edwards Landscaping. On May 31, 1995, and June 3, 1995, Green Thumb and Edwards Landscaping were each issued Purchase Orders not to exceed $45,000. (*Id.* at ¶ 5, Exh. C). The Purchase Orders contained the following provision:

This purchase order does not constitute an offer of or agreement by Fulton County to purchase goods and/or services for total consideration of any specific amount whatsoever. This purchase order authorizes payment for goods ordered and/or services requested by the Public Works Department/Office of Fulton County during the calendar year 1995; provides, however, that the total cost of all goods and/or services requested hereunder shall not exceed the aggregate total of $45,000 without issuance by Fulton County Purchasing Department of a written change order.

(*Id.* at ¶ 7, Exh. C). The purchase orders contained no promises or guarantees that either Green Thumb or Edwards Landscaping would receive any specific work or any specific amounts for any specific scope of work at any specific time. (*Id.*).

In June, 1995, Bill Mowrey, Field Operations Manager for Public Works, requested quotes from Edwards Landscaping and Green Thumb to remove trees around Spalding Drive, 5821 Lake Forest, and Mount Paran Road. (Doc. No. 110, Exh. O, Tab 8). Green Thumb bid $2,500 while Edwards Landscaping bid $3,800 for the project. (*Id.*). By memorandum dated August 3, 1995, Defendant Cooper informed Fred Artis, Director of the Public Works Department, of his concern that Green Thumb had received a purchase order in the amount of $11,800 for other projects while Edwards Landscaping had not been given any work out of its original $45,000 purchase order. (Doc. No. 110, Exh. O, Tab 1). Subsequently, by memorandum dated August 9, 1995, Mr. Mowrey stated that on each project Green Thumb had provided low bids and was able to do the work while Edwards Landscaping had given excuses why it could not do the work in a timely fashion. (*Id.*, Tab 3). In a memorandum dated August 11, 1995, Mowrey reported that Edwards Landscaping failed to show up at Camp Creek to cut down six trees. (*Id.*). Nevertheless, he recommended giving Edwards Landscaping the work order to remove trees around Spalding Drive, 5821 Lake Forest, and Mount Paran Road despite the concerns over the extra costs and the ability of Edwards Landscaping to perform the work safely. (*Id.*). Mowrey's recommendation to assign that project to Edwards Landscaping was based on Cooper's August 3, 1995, memorandum. (*Id.*, Tab 8).

In 1996, the Board approved a renewal continuing the existing 1995 tree removal service arrangements with Edwards Landscaping and Green Thumb. Green Thumb ceased being a female business enterprise when it submitted its 1996 bid for landscape maintenance. (Doc. No. 110, Exh. N, Tab 4). Due to Fulton County procedures, new purchase orders were issued to Edwards Landscaping and Green Thumb. The purchase orders were initially issued to Green Thumb in the amount of $66,000 and Edwards Landscaping in the amount of $25,000. (Doc. No. 105, Second Moore Aff. at ¶ 9, Exh. D). In a memorandum dated January 26, 1996, Defendant Cooper stated that he had received a complaint from Edwards Landscaping regarding the tree removal projects. (Doc. No. 110, Exh. O, Tab 4). Cooper requested that Public Works provide a complete listing of all work performed by Green Thumb and Edwards Landscaping and any explanation if there was a significant difference in the amount of work performed by each company. (*Id.*). Bill Mowrey subsequently reported that Edwards Landscaping failed to meet any of the competence and safety minimum requirements and had caused property damage on the Mount Paran project. (*Id.*, Tab 6). He further stated that while he was mindful of the goals of the MFBE program, he did not believe that Fulton County was moving toward those goals with Edwards Landscaping. (*Id.*). Nevertheless, he stated that he would do his best to provide Edwards Landscaping with work where there is virtually no risk to the public. (*Id.*).

In a memorandum dated February 15, 1996, from Defendant Cooper to Frank

Bockman, Acting Public Works Director, Cooper stated that he had reviewed the 1995 records which showed a discrepancy in the amount of work assigned to Edwards Landscaping and Green Thumb. (*Id.*, Tab 7). Cooper stated that Ben Edwards of Edwards Landscaping was informed that Edwards Landscaping would not be awarded certain projects due to Mowrey's dislike of minority contractors. (*Id.*). Cooper stated that Mowrey's negative evaluation of Edwards Landscaping's work was vague and not based on any objective criteria. (*Id.*). Cooper requested that Mowrey be removed from the responsibility of assigning contracts and that Public Works honor its agreement to utilize Edwards Landscaping commensurate with the dollar value of the 1995–96 contract. (*Id.*). In a memorandum dated February 21, 1996, Mowrey responded by (1) disputing the accuracy of Cooper's February 15, 1996, memorandum; (2) recounting many shortcomings of Edwards Landscaping and its failure to carry out work assignments in a professional manner; and (3) denying any improper racial motive in assigning the work. (*Id.*, Tab 8).

Subsequently, Cooper canceled the initial 1996 purchase orders issued to Green Thumb and Edwards Landscaping based on the claim of unfair favorable treatment accorded to Green Thumb. (*Id.*, Tab 9). The 1996 purchase orders to Green Thumb and Edwards Landscaping were then reissued in equal amounts of $45,500. (*Id.*, Tabs 10, 11). Tony Moore, Budget and Revenue Manager for Public Works, informed Mowrey that both Green Thumb and Edwards Landscaping were to be used equally. (*Id.*, Tab 10). In a memorandum dated March 1, 1996, Cooper stated that it was the Department's conclusion that Public Works "did intentionally direct the tree removal service contract and its funding so as to cause a disparity in business which discriminated against the minority contractor, [Edwards Landscaping]." (*Id.*, Tab 12). Bockman responded that there was no evidence of intentional discrimination against Edwards Landscaping. (*Id.*, Tab

13). He noted that the purchase orders do not guarantee the full amount of the order. (*Id.*). In his affidavit, Bockman states that he believes Cooper's primary concern was that Ben Edwards, the black owner of Edwards Landscaping, was not receiving as much business as the Websters, who are white. (Doc. No. 110, Exh. O, Bockman Aff. at ¶ 8).

In his affidavit, Daniel Webster testified that Mowrey had explained to him that the reduction in the 1996 purchase order was due to race. (Doc. No. 110, Exh. N, Daniel Webster Aff. at ¶ 4). Webster further stated that before the filing of the present Complaint, Green Thumb was on the Fulton County's mailing list and had frequently received post cards advising it of bids. (*Id.* at ¶ 5). However, after the filing of the Complaint, Green Thumb almost completely ceased receiving bid notifications. (*Id.*). Green Thumb never received a 1997 bid package for tree removal service despite its request and Fulton County's promise that it would receive one. (*Id.* at ¶ 8). In 1998, when Green Thumb bid on a Fulton County project for ground maintenance and was the low bid, Fulton County did not award it the contract. (*Id.* at ¶ 7).

In the Second Amended Complaint [Doc. No. 35], the Plaintiffs allege that Fulton County has, for at least two years, carried out a systematic program of awarding contracts to minority-owned businesses when other qualified businesses owned by persons who were white and/or male have submitted lower bids. The Plaintiffs allege that the discrimination also extends (1) against black-owned businesses because of their association with white persons; and (2) in favor of some white or male businesses because of their association with black persons. The Plaintiffs allege that Fulton County has operated since September 16, 1994, an unlawful affirmative action program, the MFBE Program, which unreasonably and unlawfully burdens and discriminates against busi-

nesses based solely on the race and/or sex of the businesses' owners.

In the Second Amended Complaint, the Plaintiffs allege that Fulton County has refused on account of race to award a contract for work to Green Thumb on the Mount Paran project and instead improperly awarded it to a minority business enterprise, Edwards Landscaping, even though Edwards Landscaping was not qualified for the job and submitted a much higher bid than did Green Thumb. The Plaintiffs further allege that Fulton County, through Defendant Cooper, breached, because of race, a contract awarded to Green Thumb by reducing Green Thumb's initial 1996 purchase order by $20,500 and increasing Edwards Landscaping's initial 1996 purchase order by $20,500.

Pursuant to Federal Rule of Civil Procedure 23, the Plaintiffs seek certification of the following proposed class: "All persons who have placed bids to provide goods or services to Fulton County, Georgia in the two years prior to the filing of this Complaint, and have been partially or fully rejected or suffered differential treatment on account of their race (white), because of their gender (male), or because of their association with white and/or male persons." The Plaintiffs seek class certification under Rule 23(b)(2) insofar as this Complaint seeks to enjoin further implementation of the Fulton County MFBE. The Plaintiffs seek class certification under either Rule 23(b)(2) or (3) insofar as all other counts involve a "hybrid class action." Their motion for class certification is pending before the Court [Doc. No. 46].

The Plaintiffs assert in Count I of the Second Amended Complaint that the Defendants unlawfully discriminated against the Plaintiffs on the grounds of race and sex in violation of § 1981 and the Equal Protection Clause, as enforced by 42 U.S.C. § 1983. In Counts II and III, the Plaintiffs assert that Defendant Fulton County has discriminated against the class of plaintiffs on the basis of race and sex, in violation of § 1981 and the Equal Protec-

tion Clause, by its policy, pattern or practice of discriminating on the basis of race in awarding contracts for goods and services. In Count IV, the Plaintiffs assert that the Defendants have violated the Equal Protection Clause of the Georgia Constitution, Art 1, § 1, ¶ 2. In Count V, the Plaintiffs assert that the Defendants impermissibly committed the acts in violation of O.C.G.A. § 48–5–220 to give tax money to persons for no reason other than their race. In Count VI, the Plaintiffs assert a retaliation claim under Section 1981 and the Equal Protection Clause. The Plaintiffs seek declaratory, injunctive and monetary relief.

The Plaintiffs have moved for summary judgment [Doc. No. 103] on their claims that the Fulton County MFBE Program is unconstitutional and should be enjoined. They contend that (1) a race-based preference scheme must be subjected to strict scrutiny to determine whether the program is narrowly tailored to achieve a compelling governmental interest; (2) a gender-based preference scheme must be subjected to intermediate scrutiny whereby the court analyzes whether the classification serves important governmental objectives and is substantially related to their achievement. They contend that the MFBE Program fails both tests. They contend that Fulton County has failed to show sufficient evidence of actual discrimination, whether active or passive, to justify any program of racial or gender preference. The Plaintiffs contend that the race and gender-conscious MFBE Program is not narrowly tailored to remedy precise evidence of discrimination. Specifically, they contend that (1) Fulton County has failed to take any steps to access the impact of the MFBE Program on innocent third parties; (2) Fulton County adopted a race-based preference program without giving serious and good-faith consideration to race-neutral measures; (3) the numerical goals of the MFBE Program far exceed the availability of minorities and females in the relevant market; and (4) the

MFBE Program is not sufficiently limited in either duration or geographic scope.

The Defendants have also filed a Motion for Summary Judgment [Doc. No. 105], offering numerous contentions in support of dismissing every claim asserted against them. The Defendants first contend that the Plaintiffs lack standing to assert their claims. They contend that (1) the Plaintiffs lack standing to challenge the MFBE Program; (2) the Plaintiffs lack standing to assert a practice or pattern of racial or gender discrimination by Fulton County; and (3) Plaintiff Goff lacks standing to sue for injunctive relief. The Defendants contend that the Fulton County MFBE Program is constitutional based on evidence identifying past discrimination against minority and female business enterprises. Based on the evidence presented, the Defendants contend that Fulton County had a compelling interest in remedying past discrimination and that Fulton County properly considered and implemented race and gender-neutral remedies. The Defendants contend that the MFBE Program is narrowly tailored to remedy past discrimination based on its flexibility toward reaching goals and its graduation, waiver and sunset provisions. The Defendants contend that Green Thumb and the Websters are constitutionally estopped from challenging the MFBE Program because Green Thumb benefitted from the program as a female business enterprise. The Defendants contend that the Plaintiffs waived their right to challenge the MFBE Program by their participation. The Defendants contend that the Plaintiffs are barred from obtaining injunctive relief under the doctrine of unclean hands as they have each manipulated the MFBE Program.

The Defendants contend that the Plaintiffs are not entitled to relief against Fulton County pursuant to Section 1981, Section 1983, or the Equal Protection Clause because they have failed to establish a pattern or practice of discrimination. The Defendants contend that the Plaintiffs'

claims against the individual Defendants fail due to lack of specific evidence of individual discrimination. Next, the Defendants contend that the Plaintiffs' claim against the individual Defendants in their individual capacities are barred because the individual Defendants are entitled to either absolute legislative immunity or qualified immunity. They contend that the Plaintiffs' Section 1981 claims are foreclosed because Section 1983 claims for damages constitute the exclusive federal remedy for violation of the rights guaranteed in a Section 1981 action. The Defendants contend that the Plaintiffs' retaliation claim fails due to insufficient evidence and the absence of a retaliation cause of action where the government fails to award contracts to independent contractor bidders.

The Defendants contend that the Plaintiffs have failed to establish a violation of either the federal Equal Protection Clause or the Georgia counterpart, which are co-extensive. The Defendants contend that the Plaintiffs have no cause of action under O.C.G.A. § 48–5–220 because that statute does not provide either a basis for the Plaintiffs' claim or a private right of action in general. The Defendants contend that the Plaintiffs claims against Fulton County are barred under O.C.G.A. § 36–11–1 because the Plaintiffs failed to provide the County with written notice of their claims within the specified 12–month period. The Defendants contend that punitive damages cannot be assessed against the individual Defendants because they cannot be held liable for punitive damages in their official capacities and can only be liable for punitive damages in their individual capacities if their conduct is motivated by evil motive or involves reckless indifference to the federally-protected rights of others. The Defendants contend that any damages awarded in this case should be limited under Georgia law to bid costs.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only when the pleadings, depositions, and affi-

davits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the non movant. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

At the summary judgment stage, the court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of material fact exists for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir.1995). "Where the record taken as a whole could not lead a rationale trier of fact to find for the nonmoving party," summary judgment for the moving party is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### III. DISCUSSION

#### A. MOTION TO STRIKE BRUNS AFFIDAVIT

In their opposition to the Defendants' summary judgment motion, the Plaintiffs submitted the affidavit of Thomas Bruns, who served from 1994 through 1997 as the Deputy Director of Purchasing for Fulton County. The Plaintiffs presented Bruns' testimony as evidence of Fulton County's pattern or practice of discrimination. The Defendants have filed a Motion to Strike Bruns' Affidavit [Doc. No. 119]. They contend that the affidavit should be stricken because it (1) does not show that he has personal knowledge and fails to provide any factual foundation; (2) contains conclusory and speculative allegations; and (3) bases its conclusory allegations upon hearsay statements that are inadmissible as evidence.

 Federal Rule of Civil Procedure 56(e) provides that an affidavit opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Affidavits based upon "information and belief" are insufficient. *Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950). The court may consider only that evidence that would be admissible at trial. *Soles v. Board of Com'rs of Johnson County, Ga.*, 746 F.Supp. 106, 110 (S.D.Ga.1990). Thus, in determining summary judgment motions, the court will refuse to consider inadmissible hearsay. *Id.* On a summary judgment motion, the court "will disregard only the inadmissible portions of a challenged affidavit and will consider the admissible portions in determining whether to grant or deny the [summary judgment] motion." *Lee v. National Life Assur. Co. of Canada*, 632 F.2d 524, 529 (5th Cir. 1980).

 In the affidavit, Bruns states that in his position as Deputy Director of Purchasing for Fulton County, he "oversaw the day-to-day operations of the Purchasing Department" and "had an opportunity to observe all aspects of purchasing at Fulton County, Georgia during this time." (Doc. No. 110, Bruns Aff. at ¶ 3). The

Court finds that Bruns had personal knowledge of purchasing sufficient for him to testify about the matters contained in his affidavit. The Court further finds that his testimony contains sufficient specificity about Fulton County's purchasing practices. Rather than striking the Bruns affidavit or any portions contained therein based on inadmissibility, the Court will simply disregard any inadmissible hearsay statements and consider the admissible portions in determining whether to grant the Defendants' summary judgment motion. Accordingly, the Defendants' Motion to Strike the Bruns Affidavit is denied.

## B. CONSTITUTIONALITY OF THE MFBE PROGRAM

### 1. STANDING

■ As a threshold inquiry, the Court must first consider the question of standing. Standing is a jurisdictional question, and the federal courts are under an independent obligation to analyze their own jurisdiction. *Engineering Contractors Assoc. of South Florida, Inc. v. Metropolitan Dade County,* 122 F.3d 895, 903 (11th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1186, —— L.Ed.2d —— (1998). In addressing an affirmative action set-aside program for contractors' services, the Supreme Court has stated that:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. To establish standing, therefore, a party challenging a set-aside program ... need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal footing.

*Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, Fla.,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993).

■ The Court is satisfied that Plaintiffs Daniel Webster, Peggy Webster and Green Thumb have standing to challenge the constitutionality of the MFBE Program. The evidence shows that Green Thumb was a female business enterprise through 1995. Nevertheless, these Plaintiffs have demonstrated that they have bid for contracts from Fulton County in 1995 and 1996 and that the participation goals for minority business enterprises in the MFBE Program potentially prevented Green Thumb from competing on an equal footing with minority business enterprises. In the words of the Tenth Circuit addressing a similar argument:

> [W]e conclude that [Plaintiff]˙has demonstrated "injury in fact" because it submitted bids on three projects and the Ordinance prevented it from competing on an equal basis with minority and women-owned prime contractors. Specifically, the unequal nature of the bidding process lies in the Ordinance's requirement that a nonminority prime contractor must meet MBE and WBE participation goals by entering into joint ventures with MBEs and WBEs or hiring them as subcontractors (or satisfying the ten-step good faith requirement). In contrast, minority and women-owned prime contractors may use their own work to satisfy MBE and WBE participation goals.... Thus, the extra requirements impose costs and burdens on nonminority firms that preclude them from competing with MBEs and WBEs on an equal basis.

*Concrete Works of. Colorado, Inc. v. City and County of Denver,* 36 F.3d 1513, 1518–19 (10th Cir.1994), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995). Contrary to the Defendants' contention, the Court further finds that the Websters and Green Thumb have standing to challenge the constitutionality of the MFBE Program as it pertains to all applications. Accordingly, the Defendants' standing argument as to the MFBE Program is without merit.[1]

 In a previous Order, the Court dismissed the claims of Plaintiff Minority Distributing Corporation and Willie Hill. The Court also held that a purported assignment by Minority Distributing to Kelly Goff of the corporation's interest in this lawsuit is invalid. Goff has not shown that he individually has ever bid on a Fulton County contract or that he is likely to bid on such a contract in the future. It is well established that shareholders lack standing to bring a Section 1983 or 1981 action claiming injury to the corporation in which they own shares. *Bellows v. Amoco Oil Company,* 118 F.3d 268, 276–77 (5th Cir. 1997), *cert. denied,* ── U.S. ──, 118 S.Ct. 739, 139 L.Ed.2d 675 (1998); *Flynn v. Merrick,* 881 F.2d 446, 449–50 (7th Cir. 1989); *Forest Ambulance Service, Inc. v. Mercy Ambulance of Richmond, Inc.,* 952 F.Supp. 296, 304 (E.D.Va.1997); *Sawmill Products, Inc. v. Town of Cicero,* 477 F.Supp. 636, 638–39 (N.D.Ill.1979). Goff is not even a current shareholder in the Minority Distributing Corporation. He has no standing to assert any claim in this action. Therefore, the Defendants are entitled to summary judgment as to Plaintiff Goff.

### 2. CONSTITUTIONAL ESTOPPEL, WAIVER, UNCLEAN HANDS

The Defendants contend that the Webster Plaintiffs are constitutionally estopped from challenging the MFBE Pro-

gram because they benefitted from the program when Green Thumb was a certified female business enterprise. The Defendants further contend that the Plaintiffs waived their right to challenge the MFBE Program by their participation. The Supreme Court has held that "[i]t is an elementary rule of constitutional law that one may not 'retain the benefits of [a statute or regulation] while attacking the constitutionality of one of its important conditions,'" *Fahey v. Mallonee,* 332 U.S. 245, 255, 67 S.Ct. 1552, 1557, 91 L.Ed. 2030 (1947) (citation omitted). However, the Supreme Court later limited the doctrine of constitutional estoppel to situations where the plaintiff owes its very existence to the statute it challenges. *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 456, 108 S.Ct. 2481, 2486, 101 L.Ed.2d 399 (1988). As the Supreme Court noted in Kadrmas in response to an invocation of the constitutional estoppel doctrine, "[a]ppellants obviously are not creatures of any statute, and we doubt that plaintiffs are generally forbidden to challenge a statute simply because they are deriving some benefit from it." *Id.* at 456–57, 108 S.Ct. at 2486.

 In this case, the Plaintiffs clearly do not owe their existence to the creation of the MFBE Program. While they have benefitted from the program when Green Thumb was certified as a female business enterprise, the Plaintiffs are not constitutionally estopped from asserting their claim that the MFBE Program is unconstitutional. The Court also finds that the Plaintiffs have not waived their right to challenge the MFBE Program due to their participation in the program as a female business enterprise. Finally, the Defendants contend under the doctrine of unclean hands that the Plaintiffs are barred from obtaining injunctive relief with regard to the MFBE Program. The Defendants contend that the Plaintiffs misrepre-

---

**1.** The Second Amended Complaint does not state whether Green Thumb is a corporation, partnership or sole proprietorship. The par-

ties have not addressed the implications of this and the Court will ignore this as long as the parties do so.

sented the ownership and control of Green Thumb to be eligible for female business enterprise status. The Court finds that this argument is without merit and requires no extended discussion.

### 3. LEGAL STANDARDS FOR SCRUTINIZING PREFERENCE PROGRAMS

 The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. The Supreme Court in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), set forth the constitutional standard applicable for programs establishing racial or ethnic preferences. The Court applied the strict scrutiny test, which requires a "searching judicial inquiry into the justification" for the preference to determine whether the classifications are either remedial or "in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Id.* at 493, 109 S.Ct. at 721. The strict scrutiny test is therefore designed to expose "illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool" and to "ensure that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.* Accordingly, the strict scrutiny test requires that racial or ethnic preference programs "must be based upon a 'compelling governmental interest' and must be 'narrowly tailored' to achieve that interest." *Engineering Contractors*, 122 F.3d at 906 (citation omitted). Explicit racial preferences may not be used except as a "last resort." *Id.* at 926.

 To uphold a racial or ethnic preference program, the district court must make a factual determination that a strong basis in evidence exists to support the conclusion that the remedial racial or ethnic program is necessary. *Engineering Contractors*, 122 F.3d at 906. General, amorphous claims of societal discrimination, simple legislative assurances of good intention, or congressional findings of discrimination in the national economy are not sufficient to establish a "strong basis in evidence." *Id.* at 907. Nevertheless, a racial or ethnic preference program can be justified by demonstrating gross statistical disparities between the proportion of minorities hired for projects or contracts, and the proportion of minorities willing and able to do the work. *Id.* Anecdotal evidence may be used to establish discrimination, especially if buttressed by relevant statistical evidence. *Id.* Accordingly, if Fulton County can show that it has become a " 'passive participant' in a system of racial exclusion practiced" in connection with the awards of projects and contracts in the county, the Supreme Court has made it "clear that the [county] could take affirmative steps to dismantle such a system." *Croson*, 488 U.S. at 492, 109 S.Ct. at 721. The following four factors provide a useful analytical structure for determining whether a race or ethnicity-conscious program is narrowly tailored: (1) necessity for the relief and the efficacy of alternative remedies; (2) the flexibility and duration of the relief, including availability of waiver provisions; (3) the relationship of numerical goals to the relevant labor market; and (4) the impact on the rights of innocent third-parties. *Engineering Contractors*, 122 F.3d at 927.

 Intermediate scrutiny is the applicable constitutional standard for analyzing programs that establish gender preferences. *Engineering Contractors*, 122 F.3d. at 907–08. Thus, to withstand constitutional challenge to a gender preference program, such gender preference must serve important governmental objectives and be substantially related to achievement of those objectives. *Id.* The proponent of a gender preference program must present sufficient probative evidence of discrimination. *Id.* at 910 The Eleventh

Circuit recognized that the "sufficient probative evidence" standard is less stringent than the "strong basis in evidence" required to bear the weight of a race or ethnic preference program. *Id.* at 909–10. The following guidelines set forth the boundaries of intermediate scrutiny evidentiary analysis: (1) the local government must demonstrate some past discrimination against women, but not necessarily discrimination by the government itself; and (2) such review "is not to be directed toward mandating that gender-conscious affirmative action is used only as a 'last resort'." *Id.* at 910.

■ In making its factual determination that either a "strong basis in evidence" or "sufficient probative evidence" exists to support the necessity of an affirmative action program, the court may consider post-enactment evidence in addition to pre-enactment evidence. *Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County,* 943 F.Supp. 1546, 1557 (S.D.Fla.1996); *aff'd,* 122 F.3d 895 (1997). Pre-enactment evidence pertains to evidence developed before Fulton County enacted the MFBE Program, and thus, could have been relied upon by the Board in adopting the MFBE Program. *Id.* Conversely, post-enactment evidence pertains to evidence developed after the MFBE Program was enacted and was therefore not relied upon as a rationale for the program. *Id.* The Eleventh Circuit has held that post-enactment evidence may be introduced into the record to determine the constitutionality of a race or gender preference program:

> Although *Croson* requires that a public employer show strong evidence of discrimination when defending an affirmative action plan, the Supreme Court has never required that, before implementing affirmative action, the employer must have already proved that it has discriminated. On the contrary formal findings of discrimination need neither precede nor accompany the adoption of affirmative action.

*Engineering Contractors,* 122 F.3d at 911 (quoting *Ensley Branch, N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1565 (11th Cir. 1994)). Consideration of post-enactment evidence is appropriate when scrutinizing race or gender preference programs because a violation of either federal statutory or constitutional requirements arises when the wrong is committed, and not with the making of a finding. *Engineering Contractors,* 122 F.3d at 911 (citing *Wygant v. Jackson Bd. Of Educ.,* 476 U.S. 267, 289, 106 S.Ct. 1842, 1855, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring)). Consideration of post-enactment evidence is especially appropriate where the principal relief sought is injunctive relief. *Engineering Contractors,* 122 F.3d at 911.

■ The Defendants bear the initial burden of production to demonstrate a "strong basis in evidence" or "sufficient probative evidence" that the race, ethnic or gender preference program aims to remedy past or present discrimination and is constitutional under the Fourteenth Amendment. *Engineering Contractors,* 122 F.3d at 916; *Concrete Works,* 36 F.3d at 1522. Notwithstanding this initial burden of proof, "[t]he ultimate burden [of proof] remains with [the challenging party] to demonstrate the unconstitutionality of an affirmative-action program." *Concrete Works,* 36 F.3d at 1522 (quoting *Wygant,* 476 U.S. at 277–78, 106 S.Ct. at 1849). As explained by the Eleventh Circuit in the context of public employment, once the proponent of a race preference plan:

> introduces its statistical proof as evidence of its remedial purpose, thereby supplying the [district] court with the means for determining that [it] had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the nonminority [employees] to prove their case; they continue to bear the ultimate burden of persuading the [district] court that the [public employer's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan insti-

tuted on the basis of this evidence was not sufficiently "narrowly tailored." *Howard v. McLucas*, 871 F.2d 1000, 1007 (11th Cir.1989) (quoting *Wygant*, 476 U.S. at 293, 106 S.Ct. at 1856 ((O'Connor, J., concurring)).

### 4. THE EVIDENCE

The Defendants have presented two types of evidence in support of the MFBE Program: (1) statistical evidence and (2) anecdotal evidence. The Court will review the evidence to determine whether the Defendants have demonstrated both the "strong basis in evidence" standard in connection with the race preference program and the less stringent "sufficient probative evidence" standard in connection with the gender preference program. The Court is mindful that this case is at the summary judgment stage, where the Court's task is not to weigh the evidence, but rather to discern whether "the record taken as a whole could not lead a rationale trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

The Defendants have presented the Brimmer–Marshall Study and the 1994 post-disparity study containing statistical evidence of past discrimination against minorities and females. (Doc. No. 105, Marshall Aff., Exhs. B and C; Boston Aff., Exhs. A–K; Second Cooper Aff., Exhs. A–M). The Brimmer–Marshall Study found large disparities in public and private contracting opportunities between minority and majority firms. (Doc. No. 105, Marshall Aff., Brimmer–Marshall Study, Part I at 88). The Brimmer–Marshall Study concluded that there was low participation by minority business enterprises in Atlanta contracting relative to the value of the contracts awarded to non-minority business enterprises. (*Id.* at 99). The Study relied on the statistical criterion establishing

a ratio of "contract dollars" going to minority business enterprises in a given year to the fraction of "available" businesses which were minority-owned in that year. This statistical relationship . . . [is] the "Utilization Percentage Ratio," or UPR. If the value of the resulting ratio or index is equal to 1.00, there is no discrimination; if it is significantly less than 1.00, this provides evidence of racial discrimination.

(*Id.* at 101). In the years 1972, 1977 and 1982, the resulting UPR's, or disparity indices, for black-owned businesses for the Atlanta Standard Metropolitan Statistical Area ("SMSA") and Fulton County computed under 20% for all industries and under 27% for construction and developers. (*Id.* at 103). The Eleventh Circuit has recognized that disparity indices greater than 80% are generally not considered indications of discrimination. *Engineering Contractors*, 122 F.3d at 914. The Brimmer–Marshall Study provides, therefore, some statistical evidence of discrimination in terms of disparity indices for minority business enterprises for the period between 1972 and 1982. (*Id.*, Part V).

The 1994 post-disparity study, prepared by Dr. Boston, evaluated the utilization of minority or female vendors by Fulton County from 1990–1993. (Doc. No. 105, Boston Aff., Exh. C). In this study, Dr. Boston concluded that minority and female firms totaled approximately 35% of all available firms. (*Id.*, Table 19(a)). The numbers broke down as follows: (1) African–Americans –28.6%; (2) white females—3.55% (3) Hispanics—1.22%; (4) Asians—1.83%; and (5) Native–Americans—.25%. (*Id.*). The post-disparity study reflects that from 1990 through 1993, the average utilization of minorities totaled 19.63% and the average utilization of females totaled 1.43%. (*Id.*, Table 19(c)). The study provides statistical evidence of discrimination between 1990 and 1993 in terms of the disparity indices of less than 80% for minority and female business enterprises, provided that there is credible evidence that minority and female firms constituted 35% of all available firms. (*Id.*, Table 19(d)).

As discussed above, the Plaintiffs have the ultimate burden to show that the MFBE Program is unconstitutional. When statistical evidence is sufficient to support an inference of discrimination, the Plaintiffs have at least the following three methods to rebut the inference of discrimination with a neutral explanation: (1) demonstrate that the statistics are flawed; (2) demonstrate that the disparities shown by the statistics are not significant or actionable; or (3) present conflicting statistical data. *Engineering Contractors*, 122 F.3d at 916. The Plaintiffs have presented several reports by Dr. George Easton, who analyzed, among other things, the validity of the statistical data contained in the Brimmer–Marshall Study and the 1994 post-disparity study. (Doc. No. 110, Exh. Y). He concluded that Part V of the Brimmer–Marshall Study does not contain credible statistical evidence of underutilization of minority business enterprises in Fulton County. (*Id.*). Dr. Easton disputes the methodology of the 1994 post-disparity study as well as the study's failure to identify the source of the data used. (*Id.*). The Plaintiffs have presented a database, based on contract awards from 1990–1993, from the Fulton County Purchasing Department showing the availability of minority and female firms to be no more than 24% based upon bidding percentages, much lower than the 35% reported in the post-disparity study. (Doc. No. 103, Exh. N). Plaintiffs' expert contends that there is no credible evidence that minority and female business enterprises constitute 35% of the business enterprises in the Atlanta metropolitan area. In his Rebuttal Report, Plaintiffs' expert contends that reliable census data shows that only 15% of available firms are minority or female owned enterprises, less than half of the set aside percentage of 35%. (Doc. 110, Ex. Y). Plaintiffs contend that Dr. Boston has admitted that the 35% figure is arrived at by adding some arbitrary figure to compensate minorities for past discrimination. This sort of speculative guesswork as to the position minorities would be in but for

past discrimination is prohibited. *Engineering Contractors*, 122 F.3d at 912. Plaintiffs' expert offers statistical evidence that from 1994 to the present, minority and female business enterprises are greatly over-represented in the award of contracts by Fulton County in relation to their availability in the marketplace. The Plaintiffs also cite the fact that the 1994 post-disparity study completely excludes commodity purchases for 1990, 1991 and 1992 and yet, Fulton County included commodity purchases in the MFBE Program.

Overall, the Defendants have presented substantial statistical evidence to support their contention that the MFBE Program was enacted to remedy past discrimination against minority and female business enterprises. The Defendants have supported this statistical evidence with anecdotal evidence of discrimination as contained in the Brimmer–Marshall Study. (Doc. No. 105, Marshall Aff., Exh. B, Part II). Nevertheless, the Court finds that the Plaintiffs, as discussed above, have identified potential flaws in the statistical evidence propounded by the Defendants and have presented evidence that the Defendants' statistical evidence is flawed in its methodology or assumptions, and fails to support an inference of discrimination sufficient to justify a 35% set aside program. "[T]he adequacy of a municipality's showing of discrimination must be evaluated in the context of the breadth of the remedial program advanced by the municipality." *Concrete Works*, 36 F.3d at 1522; *Croson*, 488 U.S. at 498, 109 S.Ct. at 724.

At the summary judgment stage, the Court cannot weigh the evidence and is unable to determine that the record as a whole would lead the reasonable fact finder to one inference. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. Upon examination of the entire record, the Court concludes that genuine issues of fact exist as to (1) the accuracy of the Defendants' statistical data and (2) whether either the "strong basis in evidence" or the "suffi-

cient probative evidence" standard was satisfied to prove that the MFBE Program aims to remedy past or present discrimination.

> Either a program is grounded on a proper evidentiary factual predicate or it is not. If it is, then that program sails on to the next stage of the analysis, where each component contract measure is tested against the "narrow tailoring" and "substantial relationship" requirements. On the other hand, if a program is not grounded on a proper evidentiary basis, then all of the contract measures go down with the ship, irrespective of any narrow tailoring or substantial relationship analysis.

*Engineering Contractors*, 122 F.3d at 906. Therefore, it is not necessary at this stage to address the narrow tailoring and substantial relationship requirements. That can be done only after a finding at trial that the MFBE Program utilizing highly suspect racial and suspect gender preferences is based upon a proper evidentiary basis.

## C. THE PLAINTIFFS' INDIVIDUAL CONSTITUTIONAL CLAIMS AGAINST THE DEFENDANTS

■ In the Second Amended Complaint, the Plaintiffs assert that the Defendants have discriminated against the Plaintiffs and the purported class, in violation of Section 1981 and the Equal Protection Clause as enforced by Section 1983, by its policy, pattern and practice of discriminating on the basis of race and sex in awarding contracts for goods and services. The Defendants contend that the Plaintiffs are not entitled to relief against Fulton County because they have failed to establish a pattern or practice of discrimination. The Defendants contend that the Plaintiffs' claims against the individual Defendants fail due to lack of specific evidence of individual discrimination. As an initial matter, the Defendants contend that the Plaintiffs lack standing to assert any claim that Fulton County engaged in a pattern or practice of discrimination. The Plain-

tiffs have alleged that the systematic awarding of contracts to minority or female business enterprises under the MFBE caused them injury in connection with the awarding of the Mount Paran project to Edwards Landscaping. The Court finds that the Plaintiffs have standing to assert their "pattern or practice" claims.

■ The Supreme Court has held that a local government, including a county, is liable pursuant to Section 1983 for its policies that cause constitutional violations. *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 117 S.Ct. 1734, 1736, 138 L.Ed.2d 1 (1997) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978)). These policies may be set by the government's lawmakers or by those individuals whose actions may fairly represent official policy. *McMillian*, 117 S.Ct. at 1736. A suit against a government officer in his official capacity is the same as a suit against the entity of which the officer is the agent. *Id.* at 1736–37 n. 2. In contrast, a suit against a government official in his individual capacity seeks to impose liability upon that official for actions he takes under the color of state law. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). To establish individual liability against a government official in a Section 1983 action, the plaintiff must show that the official's acts caused the deprivation of a federal right. *Id.* at 166, 105 S.Ct. at 3105. The Court concludes that the Plaintiffs properly brought suit against Fulton County and the individual Defendants in their official capacities based on the claim that the MFBE Program is illegal and the claim that there is a policy and practice of intentional racial discrimination in awarding contracts to prospective bidders.

■ The evidence presented demonstrates that the Board adopted and approved the MFBE Program, including the 1994 amendments. A review of the

MFBE Program shows that Cooper, as the Department's Director, retains discretion to recommend participation goals for minority and female business firms, subject to Board approval, and to grant waivers to the stated goals. The Plaintiffs have presented statistical evidence from Dr. George Easton to dispute the accuracy of the statistical evidence justifying the MFBE Program's participation goals for minorities and females. The Plaintiffs have also presented anecdotal evidence showing instances where Fulton County (1) set aside contracts for minority and female business enterprises; (2) disqualified non-minority firms even where the non-minority firm is the low bidder; and (3) diverted portions of bids to higher-bidding MFBE firms, thereby constituting discriminatory bid-splitting. (Doc. No. 110, Exhs. A, B, F, G, I, and J). The Plaintiffs have further presented evidence that Fulton County, under the direction of Defendant Cooper, impermissibly awarded a contract for work on the Mount Paran project to a minority business enterprise where Plaintiff Green Thumb was the more qualified firm for the project. (*Id.*, Exh. O). The Court finds that the totality of the evidence presented by the Plaintiffs creates genuine issues of fact as to whether Fulton County engaged in a pattern or practice of race or sex discrimination that caused injury to the Plaintiffs. Finally, the Court finds that genuine issues of material fact exist as to whether Defendant Cooper intentionally discriminated against the Plaintiffs and is liable in his individual capacity.

■ The Defendants contend that the acts of the individual Board members in proposing and adopting the MFBE Program are "quintessentially legislative." Thus, they contend that they are absolutely immune to suit under Section 1983. They further contend that Defendant Cooper's acts in drafting and proposing amendments to the MFBE Program were integral to the legislative process and that he is therefore entitled to absolute legislative immunity. The Supreme Court has held that legislators are entitled to absolute immunity from liability under Section 1983 for their legislative activities. *Bogan v. Scott–Harris*, 523 U.S. 44, 118 S.Ct. 966, 970, 140 L.Ed.2d 79 (1998). "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan*, 118 S.Ct. at 972 (citation omitted). "[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Id.* at 973. An act or action is considered legislative when it is policymaking and of general application. *Woods v. Gamel*, 132 F.3d 1417, 1420 (11th Cir. 1998). Absolute legislative immunity extends to state, regional and local legislators. *Id.* at 1419. Nevertheless, not all actions taken by local legislators are entitled to absolute immunity. A decision by a local legislator which is an application of a policy to a specific party under specific facts is not protected by legislative immunity. *See Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1392 (11th Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994). Accordingly, the Board member Defendants and Defendant Cooper are absolutely immune from liability to the extent that the Plaintiffs seek liability for any actions taken by the Defendants in approving and adopting the MFBE Program.

■ The individual Defendants next contend that they are entitled to qualified immunity because the Plaintiffs cannot show that the Defendants violated clearly established law regarding administration of the MFBE Program. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v.*

*Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The existence of Supreme Court cases or cases from this circuit recognizing a right helps determine whether the right is clearly established to a reasonably competent official. *Fortner v. Thomas,* 983 F.2d 1024, 1028 (11th Cir.1993). The principal rights allegedly violated by the individual Defendants, the Section 1981 and equal protection rights to be free from sex and racial discrimination were clearly established at the time the Plaintiffs sought the contract award for the Mount Paran project. However, it was not clear that the administration of the MFBE Program by the Board Defendants was clearly a violation of those rights in the situation. *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149–50 (11th Cir.1994) (*en banc*). Therefore, the individual Defendants, other than Defendant Cooper, are entitled to claim qualified immunity and are entitled to summary judgment on the Plaintiffs' discrimination claims in Counts I, II and III of the Second Amended Complaint. Defendant Cooper is not entitled to qualified immunity as to the Plaintiffs' claim that he discriminated against them because of their race in awarding contracts to Edwards Landscaping, and not to Green Thumb, and in reducing the 1996 purchase orders for tree removal.

██ In the Second Amended Complaint, the Plaintiffs assert a retaliation claim under Section 1981 and the Equal Protection Clause on the ground that the Defendants refused to award contracts to the Plaintiffs after Fulton County was first notified of the claims in this action. The Defendants contend that the Plaintiffs' retaliation claim fails due to insufficient evidence and the absence of a retaliation claim where the government fails to award contracts to independent contractor bidders. This Court has found no authority to support a specific retaliation claim under Section 1981 or the Equal Protection Clause for the local government's failure to award contracts to independent contractor

bidders. *Cf. Board of County Com'rs v. Umbehr,* 518 U.S. 668, 685, 116 S.Ct. 2342, 2352, 135 L.Ed.2d 843 (1996) (in allowing that an independent contractor bring .a retaliation claim for retaliatory termination of an existing contract based on protected speech activities, the Supreme Court noted that such holding does not address "the possibility of suits by bidders or applicants for new government contracts"); *Ratliff v. DeKalb County,* 62 F.3d 338, 341 (11th Cir.1995) (the court recognized that constitutional claim for retaliation may be brought under Section 1983 under the First Amendment, and not the Equal Protection Clause). Accordingly, the Court finds that the Defendants are entitled to summary judgment as to the Plaintiffs' retaliation claim in Count VI of the Second Amended Complaint.

Section 1981 covers claims for intentional racial discrimination in "the making, performance, modification and termination of [employment] contracts" and in "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981. Success on a Section 1981 claim requires proof of intentional discrimination. *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 949 (11th Cir.1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992). The Defendants contend that the Plaintiffs' Section 1981 claims are foreclosed because Section 1983 claims for damages constitute the exclusive federal remedy for violation of the rights guaranteed in a Section 1981 action. In *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989), the Supreme Court held that Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by Section 1981 when the claim is pressed against a state actor." *Id.* at 733, 109 S.Ct. at 2722. Notwithstanding this controlling authority, the Plaintiffs respond that the 1991 amendments to the Civil Rights, specifically the amendment adding subsection (c) to Section 1981, overruled *Jett* to create an express cause of

action for violations of Section 1981 by state actors. Subsection (c) to Section 1981 provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of state law." Pub.L. 102–166, Title I, § 101 (1991), 105 Stat. 1071, as amended, 42 U.S.C. § 1981(c).

The Eleventh Circuit has yet to consider whether Section 1981(c) overruled *Jett.* The district courts have split as to whether *Jett* was overruled. *Cf. Johnson v. City of Fort Lauderdale,* 903 F.Supp. 1520 (S.D.Fla.1995), *aff'd,* 148 F.3d 1228 (11th Cir.1998), *with La Compania Ocho, Inc. v. United States Forest Service,* 874 F.Supp. 1242 (D.N.M.1995). This Court agrees with the well-reasoned Johnson case which concluded that subsection (c) is consistent with *Jett* and does not create an express cause of action under Section 1981. Johnson, 903 F.Supp. at 1522–23. Thus, the only means for the Plaintiffs to seek redress for rights protected by Section 1981 is through a Section 1983 action. In all of the Plaintiffs' counts asserting Section 1981 violations, they have sought relief as enforced by Section 1983. Accordingly, while the Defendants are technically correct with their argument, the Court will not dismiss any of the Plaintiffs' constitutional claims.

The Defendants correctly assert that municipalities and municipal officers in their official capacity are not liable for punitive damages. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981); *Rankin v. City of Philadelphia,* 963 F.Supp. 463, 477 (E.D.Pa.1997); *Scheideman v. Shawnee County Bd. of County Com'rs,* 895 F.Supp. 279, 283 (D.Kan.1995). Government officials sued in their individual capacities may be held liable for punitive damages upon a showing that the Defendants' conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."

*Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The Defendants contend that no evidence has been presented that the individual Defendants were motivated by an evil motive or intent, or that they acted in reckless or callous indifference to the Plaintiffs' federally-protected rights. All of the individual capacity claims against the Board member Defendants have been dismissed. Therefore Fulton County and the Board member Defendants are entitled to summary judgment as to the claim for punitive damages. The Court finds that enough evidence has been presented to create genuine issues of fact as to whether Defendant Cooper should be liable for punitive damages if the jury finds that he engaged in intentional discrimination on the basis of race.

The Defendants contend that damages, to the extent they are awarded in this case, should be limited to bid costs. The Georgia Supreme Court has held that the only remedy in money damages under Georgia law for a disappointed bidder is the reasonable cost of preparation of the bid. *City of Atlanta v. J.A. Jones Constr. Co.,* 260 Ga. 658, 659, 398 S.E.2d 369, 370–71 (1990).

> When, as here, a governmental entity has frustrated the bid process and awarded the contract to an unqualified bidder, the injured low bidder may bring an action for appropriate relief. However, a low bidder whose bid is unfairly rejected is entitled to an award of reasonable costs of bid preparation.

*Id.* at 659, 398 S.E.2d at 370 (citations omitted). The Georgia Supreme Court further held that an award based on a Section 1983 claim for denial of due process constituted an impermissible double recovery. In rejecting the Defendants' contention that damages should be limited to bid costs, the Court finds that the *City of Atlanta* decision is inapposite to the present case. In contrast to the *City of Atlanta* case, the Plaintiffs here have not sought a state law recovery based on the

bid process for contracts. Further, this case involves federal claims of race and sex discrimination in the award of contacts, and these claims were not present in the Georgia case. Accordingly, the Court finds any damages awarded in this case are not limited to bid costs.

### D. GEORGIA EQUAL PROTECTION CLAUSE

In Count IV, the Plaintiffs assert that the Defendants have violated the Equal Protection Clause of the Georgia Constitution, Art 1, § 1, ¶ 2. In support of their summary judgment motion, the Defendants contend that the Plaintiffs are not entitled to relief under the Georgia equal protection clause. The Georgia equal protection clause and the Equal Protection Clause of the Fourteenth Amendment are coextensive. *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.*, 266 Ga. 393, 400, 467 S.E.2d 875, 881 (1996); *Grissom v. Gleason*, 262 Ga. 374, 376, 418 S.E.2d 27, 29 (1992). The Plaintiffs do not specify what relief, if any, over and above the relief to which they are entitled under federal law, they seek for the alleged violation of the Georgia Constitution. Therefore, the Court construes this claim as relating solely to the claim for declaratory and injunctive relief and not to the Plaintiffs' claim for damages. Because genuine issues of fact exist as to whether the Defendants have violated the Equal Protection Clause, the Court concludes that the Defendants are not entitled to summary judgment as a matter of law as to the state equal protection claim. The Defendants' summary judgment motion as to Count IV is therefore denied.

### E. O.C.G.A. § 48–5–220

■ In Count V of the Second Amended Complaint, the Plaintiffs assert that the Defendants impermissibly committed acts in violation of O.C.G.A. § 48–5–220 to give tax money to persons for no reason other than their race. The Defendants contend that the Plaintiffs have no cause of action under O.C.G.A. § 48–5–220

because that statute does not provide either a basis for the Plaintiffs' claim or a private right of action in general. The statute provides that "[c]ounty taxes may be levied and collected for the following public purposes ..." and lists 22 purposes for which taxes may be levied and collected. O.C.G.A. § 48–5–220. The Court concludes that the Defendants are entitled to summary judgment on this count because (1) the statute does not prohibit or otherwise proscribe the conduct of which the Plaintiffs complain; and (2) the Plaintiffs have not cited and this Court has not found any specific authority that allows a private right of action in cases such as the instant one where the statutory scheme does not provide for one. *See Cellular One, Inc. v. Emanuel County*, 227 Ga.App. 197, 199–200, 489 S.E.2d 50, 52–53 (1997) (finding no private cause of action for an alleged violation of tax revenue regulations where none was provided for in the statute).

### F. O.C.G.A. § 36–11–1

■ The Defendants contend that the Plaintiffs' claims against Fulton County are barred by O.C.G.A. § 36–11–1 because the Plaintiffs failed to provide the County with written notice of their claims within the specified 12–month period. This statute provides that:

> [a]ll claims against counties must be presented within 12 months after they accrue or become payable or the same are barred, provided that minors or other persons laboring under disabilities shall be allowed 12 months after the removal of the disability to present their claims.

O.C.G.A. § 36–11–1. The Court concludes that this statute does not apply to bar any of the Plaintiffs' federal and state constitutional claims contained in Counts I, II, III and IV. *See Terrell County v. Albany/Dougherty Hosp. Authority*, 256 Ga. 627, 630, 352 S.E.2d 378, 381 (1987) (the statute applies to claims arising from contract); *Norris v. Nixon*, 78 Ga.App. 769, 774, 52 S.E.2d 529, 532 (1949) (the claims

intended to be barred by the statute reference claims growing out of contract or breach of duty).

## IV. CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment [Doc. No. 103] is DENIED. The Defendants' Motion for Summary Judgment [Doc. No. 105] is GRANTED in part and DENIED in part. The Defendants' summary judgment motion is granted as to the claims of Plaintiff Goff. The Defendants' summary judgment motion is granted with respect to Counts V and VI and these claims are DISMISSED from this case. The Defendants Skandalakis, Hightower, Boxill, Darnell, Joyner, Lowe and Fulton are entitled to absolute and qualified immunity as to the claims against them in their individual capacities. The Court has jurisdiction as to Fulton County as an entity and there is no reason for the Board member Defendants to continue in this case solely in their official capacities. Therefore, the Defendants' summary judgment motion is granted as to Defendants Skandalakis, Hightower, Boxill, Darnell, Joyner, Lowe and Fulton. The Defendants' summary judgment motion is denied in all other respects as to Defendants Fulton County and Cooper. The Defendants' Motion to Strike the Affidavit of Thomas Bruns [Doc. No. 119] is DENIED. Pursuant to Rule 42(b), the Court will conduct a separate bench trial upon the Plaintiffs' claim that the 1994 Fulton County MFBE Program is unconstitutional. This bench trial will be scheduled as soon as possible after the Court rules upon the Motion to Certify a Class. A separate jury trial on Plaintiffs' damage claims will follow.

SO ORDERED.